# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| **JAMES M. STANLEY,** ) | |
| ) | |
| Plaintiff, ) | Case No. 2:06CV00061 |
| ) | |
| v. ) | **OPINION** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | By: James P. Jones |
| **COMMISSIONER OF** ) | Chief United States District Judge |
| **SOCIAL SECURITY**, ) | |
| ) | |
| Defendant. ) | |

*Lewey K. Lee, Lee & Phipps, P.C., Wise, Virginia, for Plaintiff; Sara Bugbee Winn, Assistant United States Attorney, Roanoke, Virginia, for Defendant.*

In this social security case, I affirm the final decision of the Commissioner.

I

James M. Stanley filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") pursuant to Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C.A. §§ 401-433, 1381-1383(f) (West 2003 & Supp. 2007). Jurisdiction of this court exists pursuant to 42 U.S.C.A. § 405(g).

My review under the Act is limited to a determination as to whether there is substantial evidence to support the Commissioner's final decision. If substantial evidence exists, the court's "inquiry must terminate," and the final decision of the Commissioner must be affirmed. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.*

The plaintiff applied for DIB and SSI on July 15, 2004, alleging disability beginning April 20, 2003, due to high blood pressure, a learning disability, and an inability to read and write. (R. at 82-87, 95.) This claim was denied on November 8, 2004 (R. at 68-72), and upon reconsideration on March 4, 2005 (R. at 74-76). At his request, the plaintiff received a hearing before an administrative law judge ("ALJ") on March 28, 2006. (R. at 54-65.) The plaintiff, who was present and represented by counsel, testified at this hearing. (*Id.*) By decision dated April 27, 2006, the ALJ denied the plaintiff's claim for DIB and SSI. (R. at 32-39.)

The plaintiff filed a request for review of the ALJ's decision with the Social Security Administration's Appeals Council ("Appeals Council"), but on August 25, 2006, the Appeals Council denied the plaintiff's request for review. (R. at 25-27.) Subsequent to this decision, the Appeals Council received additional evidence from

the plaintiff.  (R. at 7-24.)  By a notice dated November 1, 2006, the Appeals Council informed the plaintiff that it had reviewed this additional evidence and had found no reason to reopen and change its decision. (R. at 5-6.)  Thus, the ALJ's opinion constitutes the final decision of the Commissioner.  The plaintiff filed a complaint with this court on October 23, 2006, objecting to the final decision of the Commissioner.

The parties have filed cross motions for summary judgment and have briefed the issues.  The case is now ripe for decision.

II

The summary judgment record reveals the following facts.  The plaintiff was twenty-seven years old at the time of the ALJ's decision, making him a younger individual under the Commissioner's Regulations. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c) (2007).  He struggled academically and did not complete high school.[1]  He was in special education classes for most of his school career and never learned to read or write.  (R. at 57-58.)  The plaintiff's primary past work experience is as an

---

[1] The plaintiff's school records indicate that he had problems with truancy, failed the majority of his seventh and eighth grade classes, and withdrew from the ninth grade, failing. (R. at 143-44.)  It appears that he returned to school because of a court order but dropped out of the tenth grade shortly after his seventeenth birthday.  (R. at 141-42.)

-3-

assembler.[2] (R. at 95-96.) Although he claims disability with an onset date of April 20, 2003, he told his primary care doctor in September 2004 that he was looking for work. (R. at 174.) He also indicated in a report for the Social Security Administration, completed on August 30, 2004, that he was actively searching for a job. (R. at 132.)

The plaintiff states that he has a history of hypertension, but he was not treated for this condition until September 3, 2004, when he began seeing James A. Bell, M.D. (R. at 173-75.) In his report of this visit, Dr. Bell described the plaintiff's complaints and conditions as follows: major depressive disorder of three to four months duration, dyslexia, obesity, untreated hypertension, gastroesophageal reflux disease (GERD), and ongoing tobacco abuse. (R. at 175.) Dr. Bell prescribed the plaintiff medications for his hypertension, GERD, and depression. (*Id*.) A few weeks later, the plaintiff returned to Dr. Bell and indicated that his hypertension was improving with medication but that he had stopped taking his anti-depressant medication because of side effects. (R. at 172.) During this visit, Dr. Bell asked the plaintiff to refrain from the use of any alcohol and prescribed him a new anti-depressant, Lexapro. (R. at 171-72.) At the plaintiff's next appointment, he told Dr. Bell that he was feeling "a lot better" with the Lexapro. (R. at 170.)

---

[2] In his application, the plaintiff listed several other jobs that he has performed but indicated that his work as a molding operator in an assembly line is the longest job he has held. (R. at 95-96.)

-4-

On November 12, 2004, Dr. Bell completed a Medical Report for General Relief, Medicaid and Temporary Assistance for Needy Families. (R. at 169.) In this report, Dr. Bell opined that the plaintiff's depression, obesity, hypertension, and inability to read or write rendered him permanently unable to work or severely limited his capacity for self-support. (R. at 169.)

Between April 15, 2005, and January 16, 2006, the plaintiff underwent outpatient treatment at the Scott County Mental Health Center. (R. at 276-314.) The records from this center indicate that the plaintiff reported having symptoms of depression and anxiety and suffering from situational factors. (*Id*.) He also admitted to a history of cocaine and alcohol abuse. (R. at 276, 284.) The records further indicate that the plaintiff missed scheduled appointments and ultimately was discharged from the center. (R. at 276-79.)

At the request of the Virginia Department of Rehabilitative Services, the plaintiff underwent a psychological evaluation with clinical psychologist B. Wayne Lanthorn, Ph.D., on October 2, 2005. (R. at 204-13.) In addition to conducting a mental status evaluation, Dr. Lanthorn tested the plaintiff by applying the Wechsler Adult Intelligence Scale-Third Edition (WAIS-III). (R. at 204.) The WAIS-III test revealed that the plaintiff had borderline intellectual functioning. (R. at 208.) Specifically, the plaintiff's results from the WAIS-III test were as follows: a verbal IQ

Case 2:06-cv-00061-JPJ-PMS   Document 16   Filed 11/28/07   Page 5 of 18   Pageid#: 83

score of seventy-six, a performance IQ score of seventy-eight, a full scale IQ score of seventy-five, a verbal comprehension score of seventy-eight, and a perceptual organization index score of eighty-four. (R. at 204.)

Dr. Lanthorn noted that the plaintiff's mood appeared to be "somewhat depressed" (R. at 207), but that his anxiety difficulties appeared to be relatively rare (R. at 208). Although the plaintiff told Dr. Lanthorn that his antidepressant medication was no longer as effective, the plaintiff denied any homicidal or suicidal ideation. (*Id*.) Dr. Lanthorn reported that the plaintiff was able to focus his attention, persisted well at doing tasks, and showed a methodical manner in his problem-solving approach. (*Id*.)

Dr. Lanthorn diagnosed the plaintiff with mild to moderate major depressive disorder in the form of a single episode, reading and learning disorders, borderline intellectual functioning, and a personality disorder with dependent and avoidant features. (R. at 209.) He stated that the plaintiff's prognosis was good and that he had encouraged the plaintiff to receive both psychotherapeutic and psychiatric intervention. (*Id*.) He further stated that the plaintiff was "perfectly capable of performing simple and repetitive job tasks for a regular workweek cycle" and was "quite capable of taking instructions, cooperating with coworkers, etc." (R. at 210.)

Based on this evaluation, Dr. Lanthorn completed a Medical Source Statement of Ability to do Work-Related Activities (Mental), dated October 20, 2005. (R. at 211-13.) In this questionnaire, Dr. Lanthorn responded that the plaintiff's impairments did not prevent him from making judgments on simple, work-related decisions or understanding, remembering, and carrying out short, simple instructions. (R. at 211.) Dr. Lanthorn did note that the plaintiff was moderately restricted in his ability to understand, remember, and carry out detailed instructions. (*Id*.) He further indicated that while the plaintiff had a moderate restriction in his ability to interact appropriately with the public, he had only a slight restriction in his ability to interact appropriately with supervisors and co-workers. (R. at 212.) The plaintiff's ability to respond appropriately to work pressures in a usual work setting and to changes in a routine work setting was also described as only slightly impaired. (*Id*.)

The plaintiff was then evaluated on October 17, 2005, by Robert S. Spangler, Ed.D., a licenced psychologist. (R. at 225-34.) Dr. Spangler administered several tests, including the WAIS-III, the Wide Range Achievement Test, and the Bender Visual Motor Gestalt Test. (R. at 228.) The WAIS-III scores were as follows: a verbal IQ score of seventy-three, a performance IQ score of eighty-six, and a full scale IQ score of seventy-seven, indicative of the borderline range of intelligence. (*Id*.) Dr. Spangler also conducted a clinical interview and a mental status exam and reviewed the

plaintiff's medical records (*Id.*), before diagnosing the plaintiff with moderate, recurrent major depressive disorder, a moderate adjustment disorder with an anxious mood, low borderline intelligence, functional illiteracy, marginal education math skills, and a dependant personality disorder. (R. at 229.) Dr. Spangler further noted the plaintiff's history of obesity, hypertension, GERD, and high cholesterol. (*Id.*)

Based on his evaluation, Dr. Spangler also completed a Medical Assessment of Ability to do Work-Related Activities (Mental) on October 17, 2005. (R. at 232-34.) Dr. Spangler indicated that the plaintiff had a fair ability to make most occupational adjustments and a good ability to interact with supervisors and maintain attention and concentration. (R. at 232.) Although he indicated that the plaintiff had poor or no ability to follow complex or detailed job instructions due to his borderline intelligence, functional illiteracy, and marginal education math skills, Dr. Spangler did opine that the plaintiff had a good ability to follow simple job instructions. (R. at 233.) Dr. Spangler further stated that, despite his impairments, the plaintiff had a fair ability to make most personal/social adjustments and a good ability to maintain his personal appearance. (*Id.*) He estimated the plaintiff's global assessment of functioning ("GAF") score to be fifty-five.[3] (*Id.*) While Dr. Spangler concluded by stating that the

---

[3] The GAF scale is a method of considering psychological, social and occupational function on a hypothetical continuum of mental health. The GAF scale ranges from 0 to 100, with serious impairment in functioning at a score below 50. Scores between 51 and 60

plaintiff's low intellect limits his access to the job market because he cannot complete a job application on-site, he also stated that the plaintiff's impairments would cause him to be absent from work only about one day a month. (R. at 234.)

The evidence in this case also consists of the testimony of a vocational expert. (R. at 63-65.) During the hearing on March 28, 2006, the ALJ asked this expert how she would classify the plaintiff's past work as an assembler. (R. at 63.) The vocational expert responded that the plaintiff's past work was performed at a light exertional level and should be characterized as unskilled work. (*Id*.) The ALJ then asked the vocational expert to consider whether jobs existed in significant numbers in the regional and national economy for a hypothetical man the same age as the plaintiff with his same height, weight, education, work background, and residual functional capacity. (*Id*.) As to the plaintiff's residual functional capacity, the ALJ instructed the vocational expert to assume that this hypothetical man was illiterate, had an "intellectual endowment in the borderline range," and had an emotional disorder consistent with Dr. Lanthorn's assessment. (*Id*.)

The vocational expert responded that this hypothetical man could work as a hand packager, sorter, assembler, inspector, or cleaner or in a food-service related

---

represent moderate symptoms or a moderate difficulty in social, occupational, or school functioning. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994).

occupation. (R. at 64.) The vocational expert stated that these were just a representative sampling of entry-level, unskilled jobs, performed at a light or medium exertional level. (*Id*.) She estimated that about 5,000 of the medium level jobs existed in the region and 7,000,000 existed nationwide. (*Id*.) She further estimated that there were about 7,500 of the light level jobs regionally and 10,000,000 nationwide. (*Id*.)

III

My review is limited to a determination of whether there is substantial evidence to support the Commissioner's final decision and whether the correct legal standard has been applied. 42 U.S.C.A. § 405(g); *see Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). If substantial evidence exists, the final decision of the Commissioner must be affirmed. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotations omitted). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws*, 368 F.2d at 642. It is the role of the ALJ to resolve evidentiary conflicts, including inconsistences in the evidence. It is not the role of this court to substitute its judgment for that of the Commissioner, as long as substantial evidence provides a basis for the Commissioner's decisions. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

The plaintiff bears the burden of proving that he is under a disability. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). The standard for disability is strict. The plaintiff must show that his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C.A. § 423(d)(2)(A).

The Commissioner applies a five-step sequential evaluation process in assessing DIB and SSI claims. The Commissioner considers, in sequence, whether the claimant: (1) has worked during the alleged period of disability; (2) has a severe impairment; (3) has a condition that meets or equals the severity of a listed impairment; (4) could return to his past relevant work; and (5) if not, whether he could perform other work present in the national economy. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2007). If it is determined at any point in the five-step analysis that the claimant is not disabled, then the inquiry immediately ceases. *See id.*; *Bowen v. Yuckert*, 482 U.S. 137, 141-42 (1987).

When considering the third step, the ALJ found that while the plaintiff had severe impairments, his impairments were not "'severe' enough to meet or medically equal, either singly or in combination, one of the [listed impairments]." (R. at 35.) The

-11-

plaintiff contends that he has shown an impairment equal to the mental retardation listing in subsection 12.05(C) of appendix 1. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05(C) (2007). Thus, the first issue in this appeal is whether the record supports the ALJ's decision that the plaintiff does not have a condition that meets or equals the severity of a listed impairment.

In order for the plaintiff to show that his impairment matches a listing in appendix 1, the plaintiff must "present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990); *see also* 20 C.F.R. §§ 404.1526, 416.926 (2007). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan*, 493 U.S. at 530. Furthermore, a diagnosis alone is insufficient to establish medical equivalence with a listed impairment. *See* 20 C.F.R. §§ 404.1525(d), 416.925(d) (2007).

Some listings have a narrative introductory paragraph that sets forth "specific criteria for establishing a diagnosis, confirming the existence of an impairment, or establishing that [the] impairment(s) satisfies the criteria of a particular listing in the body system." 20 C.F.R. §§ 404.1525(c)(2), 416.925(c)(2) (2007). A plaintiff usually must satisfy the criteria established in this introductory paragraph. *See* §§ 404.1525(c)(3), 416.925(c)(3) (2007) ("[The impairment] meets the requirements of a

-12-

listing when it satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the duration requirement.")

The introductory paragraph to section 12.05 states, "Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the development period . . . ." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05. Subsection 12.05(C) then sets forth that the claimant must have, "A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairments imposing an additional and significant work-related limitation of function." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05(C).

In determining that the plaintiff did not meet the criteria of a listed impairment, the ALJ reviewed the plaintiff's IQ scores from the WAIS-III tests administered by Dr. Lanthorn and Dr. Spangler. (R. at 34, 35, 204, 228.) As mentioned, the plaintiff's results from the WAIS-III test administered by Dr. Lanthorn were as follows: a verbal IQ score of seventy-six, a performance IQ score of seventy-eight, a full scale IQ score of seventy-five, a verbal comprehension score of seventy-eight, and a perceptual organization index score of eighty-four. (R. at 204.) Dr. Spangler, meanwhile, found that the plaintiff had a verbal IQ score of seventy-three, a performance IQ score of eighty-six, and a full scale IQ score of seventy-seven. (R. at 228.) The ALJ also relied

on records indicating that the plaintiff was consistently diagnosed with borderline intellectual functioning rather than mental retardation. (*See* R. at 34-35.)

Despite these scores, the plaintiff argues that he has met the requirements of 12.05(C). (Pl.'s Mot. Summ. J. & Mem. Law 6-9.) In support of his argument, the plaintiff relies on Dr. Spangler's comment that the plaintiff's impairment "[*m*]*ay* equal 12.05c. His VIQ is within the SEM of 12.05c and there is no functional difference between a score of 73 and one of 70." (R. at 234) (emphasis added). However, despite this comment, Dr. Spangler presented no medical findings suggesting that the plaintiff had the deficits in adaptive functioning required by subsection 12.05(C). (R. at 225-29.) And while, the plaintiff contends that he suffers from "other mental impairments [that] impose additional and significant work-related limitations of function" (Pl.'s Mot. Summ. J. & Mem. Law 9), the plaintiff's preferred expert, Dr. Spangler, opined that, despite the plaintiff's low IQ and other diagnoses, he had a fair ability to make most occupational and personal/social adjustments and could follow simple job instructions. (R. at 232-33.)

Furthermore, in rejecting the plaintiff's argument that his other impairments such as severe depression or learning disabilities limited his functioning, the ALJ emphasized that Dr. Bell had indicated that the plaintiff's depression improved with medication. (R. at 36.) The ALJ noted that the plaintiff had not required

-14-

hospitalization for a severe mental disorder at any time during the period in issue and that he reported performing several activities of daily living. (R. at 37.) The ALJ also discredited the plaintiff's claim that his learning disabilities and his inability to read or write prevented him from working and noted that "these conditions have not precluded him from working in the past." (R. at 36.) In general, the ALJ found the plaintiff's credibility lacking due to his failure to keep medical appointments, his history of alcohol and cocaine abuse, and his legal history. (*Id*.)

Because the plaintiff's IQ test scores do not fall within the range set forth in 12.05(C) and because the medical findings do not support the plaintiff's allegations that he has deficits in adaptive functioning, I find that substantial evidence supports the ALJ's conclusion that the plaintiff does not have a condition that meets or equals the severity of a listed impairment.

After concluding that the plaintiff's impairments were not severe enough to medically equal a listed impairment, the ALJ went on to consider whether the plaintiff retained the residual functional capacity to perform his past work or alternative work. In determining that the plaintiff did retain the residual functional capacity to perform his past work as an assembler or other work, the ALJ chose to rely on the opinion of Dr. Lanthorn over that of Dr. Spangler. (*Id*.) The plaintiff contends that the ALJ erred in his decision because he did not properly weigh Dr. Spangler's opinion. (Pl.'s Mot.

-15-

Summ. J. & Mem. Law 9-12.) Therefore, the second issue in this appeal is whether the record supports the ALJ's decision to discredit Dr. Spangler's opinion.

Generally the opinions of treating sources are given more weight in reaching a disability determination. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2007). But a treating source's opinion is entitled to controlling weight only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record . . . ." §§ 404.1527(d)(2), 416.927(d)(2). The opinion must also be about the nature and severity of the impairment. §§ 404.1527(d)(2), 416.927(d)(2).

The regulations outline several factors that an ALJ is to consider when weighing a medical opinion. Among those factors are: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of examination; (3) the nature and extent of the treatment relationship; (4) the degree to which evidence supports the opinion; (5) the consistency of the record as a whole; (6) the specialization of the physician; and (7) any other factors which tend to support or contradict the opinion. §§ 404.1527(d)(1)-(6), 416.927(d)(1)-(6); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996.)

-16-

Case 2:06-cv-00061-JPJ-PMS   Document 16   Filed 11/28/07   Page 16 of 18   Pageid#: 94

In support of his decision to afford greater weight to Dr. Lanthorn's opinion, the ALJ first noted that the plaintiff was only evaluated by Dr. Spangler on one occasion at the request of the plaintiff's attorney. (R. at 36.) The ALJ then found that Dr. Spangler's assessment was not consistent with the GAF score of fifty-five that he assigned or with his own narrative report. (*Id*.) As the plaintiff concedes, this GAF score is indicative of an individual who has only moderate symptoms or moderate difficulty in social or occupational functioning. (Pl.'s Mot. Summ. J. & Mem. Law 10.) Furthermore, the ALJ observed that Dr. Spangler's report states that the plaintiff demonstrated adequate social skills, good concentration, that he related well with the examiner, and that he was "appropriately persistent on the assessment tasks." (R. at 36.) Thus, while Dr. Lanthorn also evaluated the plaintiff on only one occasion, because Dr. Spangler's opinion was not supported by his own findings, the ALJ correctly afforded it less weight.

In short, because the ALJ properly found that the plaintiff does not have a condition that meets or equals the severity of a listed impairment, and the ALJ properly weighed Dr. Lanthorn's and Dr. Spangler's opinions, I find that the Commissioner's final decision is supported by substantial evidence.

IV

For the foregoing reasons, the plaintiff's motion for summary judgment will be denied, and the Commissioner's motion for summary judgment will be granted. An appropriate final judgment will be entered affirming the Commissioner's final decision denying benefits.

DATED: November 28, 2007

/s/ JAMES P. JONES
Chief United States District Judge